JERAD KEITH GRAVITT
OKLAHOMA ODOC NO. 706129
OKLAHOMA DEPARTMENT OF CORRECTIONS
_____

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JERAD KEITH GRAVITT | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | CIV-19-551-C |
| vs. | ) | Case Number: CIV-17-378-R |
| | ) | |
| JOE M. ALLBAUGH, Director,[1] | ) | |
| and CARL BEAR, Warden, | ) | |
| Joseph Harp Correctional Center | ) | |
| | ) | |
| Defendants. | ) | |

**PETITION UNDER 28 U.S.C. §2254 FOR WRIT
OF HABEAS CORPUS FOR A PERSON IN STATE CUSTODY
AND BRIEF IN SUPPORT**

Jack Fisher OBA #2939
Post Office Box 1976,
Edmond, Oklahoma 73083
Telephone: 405/ 235-9466
Facsimile: 405/340-7269
E-mail: okfishlaw@aol.com

Attorney for Petitioner
Jerad Keith Gravitt

June 18, 2019

---

[1]The Petitioner is in custody of the Department of Corrections and has been since his conviction. On March 25, 2016 he was temporarily transferred to the Oklahoma County Jail on an unrelated 2015 offense and has since that time been in Joseph Harp Correctional.

I.      TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..i.

II.     TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii.

III.    LIST OF ATTACHMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi.

IV.     CUSTODY INFORMATION AND PROCEDURAL HISTORY. . . . . . . . . . . . . . .   vi.

V.      GROUNDS FOR RELIEF RAISED IN THIS HABEAS PETITION.. . . . . . . . . . . . . 1

VI.     GROUND ONE

        THE TRIAL COURT'S REFUSAL TO INSTRUCT THAT VOLUNTARY
        INTOXICATION IS A DEFENSE UNDER OKLAHOMA LAW
        VIOLATED PETITIONER'S CONSTITUTIONAL
        RIGHT TO PRESENT A DEFENSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        A.  INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        B. TRIAL FACTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        C.  ARGUMENT GROUND ONE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.      The State Court Decision Was Based an Unreasonable Determination of
                the Facts and Unreasonable Application of Clearly Established Federal Law. . . . 5

        2.      Denial of Due Process of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        3.      The Failure to Instruct Error Was Not Harmless. . . . . . . . . . . . . . . . . . . . . . . 9

VI.  GROUND TWO

        DIRECT APPEAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY
        FAILING TO PRESENT THE AVAILABLE WINNING CLAIM THAT TRIAL
        COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT AVAILABLE
        EXPERT TESTIMONY FROM A QUALIFIED EXPERT REGARDING
        PETITIONER'S INTOXICATION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.  Exhaustion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.  Standard of Review in Federal Habeas. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        C.  Post-conviction Proceedings in the State District Court.. . . . . . . . . . . . . . . . . 12

        D.  The State District Court Evidentiary Hearing on Ground Two. . . . . . . . . . . . . . 13

        1.      Testimony of Neuropharmacologist Dr. Jonathan Lipman, PhD. . . . . . . . . . . . 13

2.      Bill Foster  - Trial Lawyer Testimony at State Evidentiary Hearing. . . . . . . . . . .  16

3.      Andrea Miller  - Appeal Counsel Testimony at Evidentiary Hearing. . . . . . . . . .  18

E.      ARGUMENT AND AUTHORITIES

1.      Trial Counsel Failed to Investigate and Present Expert Testimony
        Regarding Petitioner's Inability to Form Intent Due to Intoxication. . . . . . . . . . .  19

2.      The Strickland Performance Prong. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

        A.      Counsels Decision Not to Interview and Retain a
                Neuropharmacologist or Other Expert Was Not supported by
                a Reasonable and Informed  Investigation and Is Not Entitled
                to Deference  as a Strategic Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

        B.      Counsels Decision Not to Interview and Retain a
                Neuropharmacologist or Other Expert Was Not supported
                by a Reasonable and Informed Investigation and Is Not
                Entitled to Deference as a Strategic Decision. . . . . . . . . . . . . . . . . . . . .  22

        C.      The Decision Not to Present an Expert Is
                Objectively Unreasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

        D.      Prejudice From the Lack of Expert Requires
                Habeas Corpus Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

VII.    GROUND THREE - CUMULATIVE ERROR. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

VIII.   PRAYER AND REQUEST FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

ii.

## II.  TABLE OF AUTHORITIES

FEDERAL CASES

Anderson v. Sirmons, 476 F.3d 1131, 1145 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . .  9

Bowen v. Kemp, 832 F.2d 546, 550 n. 11 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . .  25

Bullock v. Carver, 297 F.3d 1036, 1044 (10th Cir.2002). . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Cargle v. Mullin, 317 F.3d 1196, 1205 (10th Cir. 2003).  . . . . . . . . . . . . . . . . . . . . . . . .  20, 25, 27

Crane v. Kentucky, 476 U.S. 683, 690 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 26

Dunn v. Roberts, 963 F.2d 308, 314 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Evitts v. Lucey, 469 U.S. 387,  396 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Fisher v. Gibson, 282 F.3d 1283, 1296 (10th Cir. 2002).  . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Fourteenth Amendment." See Hicks v. Oklahoma, 447 U.S. 343, 346 (1980). . . . . . . . . . . . . .  8

Fry v. Pliler, 551 U.S. 112, 119 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 10 (1979) . . . . . . . . . . . . . . . . . . . . . . . .  8

Holmes v. South Carolina, 547 U.S. 319, 324  (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Hooks v. Workman, 606 F.3d 715, 723 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Hopper v. Evans, 456 U.S. 605, 610 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Hughes v. Mathews, 576 F.2d 1250, 1256-57 (7th Cir.1978) . . . . . . . . . . . . . . . . . . . . . . . . .  26

Jefferson v. Upton, 130 S.Ct. 2217, 2219 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

Kimmelman v. Morrison, 477 U.S. 365, 378 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

Kotteakos v. United States, 328 U.S. 750 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9, 11

Littlejohn v. Trammell, 704 F.3d 817, 861(10th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . .  25

Murtishaw v. Woodford, 255 F.3d 926, 970 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Neill v. Gibson, 278 F.3d 1044, 1057 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . .  12, 14, 15

Paine v. Massie, 339 F.3d 1194 (10th Cir.2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

Rompilla v. Beard, 545U.S. 374,125 S.Ct. 2456, 2462, 2467 (2005)................... 24

Selsor v. Workman, 644 F.3d 984 at 1027 .(10th Cir. 2011) ...................... 9, 10

Smith v. Mullin, 379 F.3d 919 (10th Cir.2004) ............................... 23, 25

Smith v. Robbins, 528 U.S. 259, 285, (2000) ................................. 20

Taylor v. Kentucky, 436 U.S. 478, 487 n. 15 (1978) ............................ 26

Taylor v. Workman, 554 F.3d 879, 893-94 (10th Cir. 2009) ....................... 8

United States v. Brawner, 471 F.2d 969, 998-1002 (D.C. Cir.1972) ................. 26

United States v. Demma, 523 F.2d 981, 986-87 (9th Cir.1975) ..................... 26

United States v. Rivera, 900 F.2d 1462, 1477 (10th Cir.1990) (en banc) . .............. 27

United States v. Sloan, 933 F.2d 833, 842 (10th  Cir. 1991) ...................... 26

United States v. Staggs, 553 F.2d 1073, 1076 (7th Cir.1977) ..................... 26

Vitek v. Jones, 445 U.S. 480, 488 (1980) ................................... 8

Wiggins v. Smith, 123 S.Ct. 2527, 2637(2003) ............................. 22, 23

Williams v. Taylor, 529 U.S. 362, 397–98 (2000)............................. 23

Zafiro v. United States, 506 U.S. 534, 540-41 (1993). ........................... 12

STATE CASES

Ball v. State, 173 P.3d 81, 89 (Okl. Cr. 2007) ................................ 25

Cuesta-Rodriguez v. State, 241 P.3d  214 (Okl. Cr. 2011) . ....................... 24

Fitzgerald v. State, 972 P.2d 1157, 1174 (Okl. Cr. 1998) ..................... 20, 25, 27

Jackson v. State,964 P. 2d 875, 892 (Okl. Cr. 1998) .......................... 6, 26

Malone v. State, 168 P.3d 185, 198 (2007) .................................. 26

Turrentine v. State, 1998 OK CR 33 ...................................... 26

FEDERAL STATUTES

28 U.S.C. § 2254(d)(1)-(2) ........................................ 19, 20, 22

STATE STATUTES

Okla. Stat. tit. 22, § 834 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

22 O.S. § 1084 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

## III.  LIST OF ATTACHMENTS

1.      Certificate of Service

2.      Civil Cover Sheet

3.      Decision of the Oklahoma Court of Criminal Appeals in *Jerad Gravitt v. State*, in Case No F-2015-75

4.      Oklahoma OUJI Instructions on Voluntary Intoxication

5.      Amended Affidavit and Report Dr. Jonathan Lipman, PhD DAAPM and Curriculum Vitae Dr. Jonathan Lipman

6.      Affidavit of Andrea Miller - Direct appeal counsel

7.      Affidavit of William R. Foster - Counsel at Trial

8.      Booking information - Computer Screen Shot
        For prisoner Jerad Gravitt (DOB 9-31-1988) Oklahoma County Jail

9.      Dr. Lipman calculated blood level alprazolam (Xanax) of Jerad Gravitt based on his height and weight and amount consumed

10.     Order Denying Post-Conviction Relief Trial Court July 23, 2018

11.     Transcript of Evidentiary Hearing in Post-Conviction April 16, 2018

12.     Oklahoma Court of Criminal Appeals Order Denying Appeal of Denial of Post-Conviction Relief on the merits dated April 3, 2019.

13.     Judge Russell Order Dismissing without Prejudice CIV-17-378-R previous §2254 Petition in this Case *Gravitt v. Allbaugh*, April 27, 2019. Doc. 9

## IV.  CUSTODY INFORMATION AND PROCEDURAL HISTORY

1.     Petitioner Jared Keith Gravitt, ODOC#706129 has been illegally confined in the Department of Corrections (DOC) since his Judgment and Sentence were entered in Oklahoma County District Court in CF-2014-3152 on January 20, 2015. He is incarcerated at Lexington Correctional Center, Lexington, Oklahoma in the custody of Warden Carl Bear.

2.     Petitioner does not claim indigency at this time. Fees will be paid by retained counsel.

3.    Petitioner was convicted by jury on December 11, 2014. Date of Judgment of conviction is January 20, 2015, the Oklahoma County District Court case number is CF-2014-3152.

4.    Petitioner was convicted of the following crimes: Count 1, assault with a dangerous weapon and sentenced to Six Years; Count 2, shooting with intent to kill, in violation of 21 O.S.2011, § 652(C) and sentenced to 33 years in Count 3, possession of a firearm after former conviction of a felony, in violation of 21 O.S. 1283 and sentenced to 6 years. The Honorable Ray C. Elliott, District Judge, pronounced judgment and ordered the sentences be served consecutively.

5.    He appealed his convictions on all three counts to the Oklahoma Court of Criminal Appeals,(OCCA), Case No. F-2015-75. The Judgment and Sentence of the District Court of Oklahoma County was affirmed on April 5, 2016. The "summary opinion" of the OCCA is attached hereto as Attachment three (3).  The OCCA entered a one sentence finding and order, the trial court did not abuse its discretion in refusing the voluntary intoxication instruction as the evidence showed that Appellant "was not in the advanced state of intoxication he attempt[ed] to assert" at trial," *citing Turrentine v. State*, 1998 OK CR 33, ir 31, 965 P.2d 955, 969 (Okl. Cr. 1998). See Summary Opinion Attached as Attachment Three (3).

6.    The following Grounds were Raised on Direct Appeal:

Proposition I:  the Trial Court Committed Reversible Error in Refusing to Instruct the Jury on the Defense of Voluntary Intoxication in Violation of Mr. Gravitt's Sixth and Fourteenth Amendment Rights to Due Process and the Right to Present a Defense

Proposition II:  The Evidence Was Insufficient to Prove Mr. Gravitt's Guilt Beyond a Reasonable Doubt and Therefore His Convictions must Be Reversed and Remanded with Instructions to Dismiss

Proposition III:  Mr. Gravitt's Conviction for Both Shooting with Intent to Kill and Possession of a Firearm after Former Conviction of a Felony Violates Okla. Stat. Tit. 21, 8 11 and State and Federal Constitutional Protections Against Double Jeopardy Requiring
Vacating One of the Convictions

vii.

Proposition IV- Trial Counsel's Deficient Performance Deprived Mr. Gravitt of His Right to Effective Assistance of Counsel under the Sixth Amendment of the United States Constitution (counsel failed to object to Mr. Gravitt's charge and conviction of both Count 2, shooting with intent to kill, and Count 3, possession of a firearm AFCF) amounting to double jeopardy

Proposition V - Trial Errors, When Considered in a Cumulative Fashion, Warrant a New Trial or a Sentence Modification

7.      Petitioner did not seek further review by a higher State Court because in there is no higher court to reviews criminal cases. He did not file a Pet. For Cert. in the US Supreme Court.

8.      Petitioner filed an Application for Post-Conviction Relief in Oklahoma County District Court, on April 4, 2017, Case No. CF-2014-3152 and requested an evidentiary on a single issue that is presented herein as Ground Two — that Direct Appeal counsel provided Ineffective Assistance of Appellant Counsel by Failing to Conduct a Reasonable Investigation and Present Available Claims That Trial provided Ineffective Assistance of Counsel by failing to Conduct a Reasonable Investigation and Present Available Expert Testimony from a qualified expert witness regarding the issue of voluntary intoxication.  This issue is presented in the this Petition as Ground Two.  This underlying issue was not presented on direct appeal due to the error of appellate counsel. Petitioner also filed his Application for Post-Conviction relief in the Oklahoma County District Court and asked that the Petition be held in abeyance pending exhaustion. On April 27, 2017 this court dismissed the Petition finding that Ground two was not exhausted, the Petition was "mixed" and dismissed the Petition w/o prejudice to refiling after exhaustion was complete. See Attachment 13.

9.      In the post-conviction case in Oklahoma County the state conceded that an evidentiary hearing was required based on Dr. Jonathan Lipman's affidavit "it impossible that (petitioner) could have acted with a mind sufficiently unimpaired to cognitively and knowingly form the specific criminal intent necessary to the underlying criminality of his behavior."

State Response to APCR

citing Dr. Lipman affidavit and report. Attachment Five (5) at page 9.

10.     The evidentiary hearing was held April 16, 2018.  The Court received the testimony of Dr. Lipman, direct appeal counsel Miller and trial counsel Foster.  The Court denied relief and refused to engage in the distorting effects of hindsight.  Ms. Miller "would not be judged ineffective by hindsight" §and found that both trial and appellate counsel made a reasonable strategic decision that an expert was not necessary to obtain an instruction on voluntary intoxication and therefore they were not ineffective by their failure to retain an expert.  *See* Trial Court Order Denying Post-Conviction Relief July 23, 2018 Attachment (10) Ten.

11.  This decision was appealed to the OCCA and they also denied relief finding Petitioner "failed to show that trial counsel's actions were unreasonable in light of the facts and circumstances of the case, including the testimony (at trial) regarding Gravitt's intoxication" based on the premise it was reasonable to assume a voluntary intoxication instruction would be granted. Order Attachment Twelve (12). No other appeals or applications have been filed. This § 2254 Petition is timely filed.

## V.  GROUNDS RAISED IN THIS HABEAS CORPUS PETITION

## VI.  GROUND ONE

### THE TRIAL COURT'S REFUSAL TO INSTRUCT THAT VOLUNTARY INTOXICATION IS A DEFENSE UNDER OKLAHOMA LAW VIOLATED PETITIONER'S CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE

### A.  INTRODUCTION

The only contested issue in this case is whether or not Petitioner was so utterly intoxicated due to his voluntary ingestion of Xanax, heroin and alcohol that he was rendered incapable of forming the intent to injure or kill as charged in Counts One and incapable of forming the intent to injure in Count Two.  "Voluntary intoxication" is not a complete defense, but may be considered in determining whether the defendant formed the necessary intent.  *Fitzgerald v. State*, 972 P.2d 1157, 1174 (Okl. Cr. 1998).  The jury was not informed this was the law because the trial court refused this intoxication instruction. The jury was left confused and without guidance how to apply the evidence of Petitioner's intoxication and blackout during their deliberations. What standards applied and what was the purpose?  Is that even a defense? According to the prosecutor it was no a defense at all.

### B. TRIAL FACTS

Around 2 a.m. on May 4, 2014, Petitioner and his girlfriend, Brittany Tabor entered the Walgreens store on 89th and Pennsylvania in south Oklahoma City. Ms. Webber, the cashier, testified Petitioner and a girl came into the store. She explained "every time they come in they steal." She could smell alcohol on Petitioner but it wasn't "overwhelming." Tr. II 42-43. Ms. Tabor, got a drink out of the cooler, took a drink, and put it back. Ms. Hall, radioed Ms. Webber to tell her that Petitioner and Ms. Tabor were sitting on the floor in the middle of one of the aisle. Tr. II 39.  She saw them get up and Petitioner went into the bathroom. Tr. II 39. He remained so long that she feared he passed out. She asked Mr. Hall, the pharmacist, to check on him. Petitioner came out and

Mr. Davis asked them if they were driving and offered to call a cab. Tr. II 40-41. They declined. Petitioner started digging through his pockets and Ms. Webber saw a knife. Tr. II 41. Mr. Davis went back to the pharmacy. Mr. Gravitt returned to the bathroom and Ms. Webber told Mr. Davis to call the police because they were going to steal and he complied. Tr. II 41. Ms. Webber heard the couple leave the store. Tr. II 42. She followed them to get the tag number and saw them walking. Tr. II 55-56. She asked them if they would return the items they took. Tr II 57. Petitioner walked towards her, handed her the items and a twenty dollars and said "just take it." Tr. II 57. Ms. Webber told him to keep the money but get off the property and "don't come back." Tr. II 57.  She turned and Petitioner ran up behind her and said "I'll give you a reason to call the cops, you bitch." Tr. II 57. He then jumped up and kicked a trash can over, lost his balance and hit her arm. Tr. II 58. Ms. Webber thought she was stabbed on the but she had not. Tr. II 58, 61 The couple ran north from the store.

Ms. Webber said the police arrived and she told the officer the couple ran away and he went after them. Ms. Webber went into the men's restroom to clean it and found Petitioner's wallet. She gave it to the police and they discovered Mr. Gravitt's identification inside. Tr. II 64. State's exhibit 6. She also discovered a white powdery substance on the back of the toilet and a straw that appeared to have been burnt. Tr. II 66. More powder was found in a paper towel. Tr. II 168-169. No one else had been in the men's restroom. Tr. II 66. On cross-exam, Ms. Webber testified that Petitioner smelled of alcohol, had beet-red eyes, she believed him to be intoxicated and was concerned he had passed out in the bathroom. Tr. II 68-70. On redirect she agreed Petitioner was aware of what was going on Tr. II 43, 71-72). Mr. Davis, the pharmacist testified Ms. Hall, the store manager, believed both of the people to be intoxicated. Tr. II 75. Mr. Davis was sufficiently concerned about Petitioner's and Ms. Tabor's well-being that he offered to get them a cab. Tr. II 76. When they declined he called 911 because he was worried that they were too intoxicated to drive. Tr. II 77.  He called a second time to report that Ms. Webber had a knife pulled on her. Tr. II 78. State's exhibit

5.  He testified that heroin is an opiate and Xanax is a sedative. Tr. II 83. The combined effect of those drugs would be to exacerbate the side effects of each one. Tr. II 83. He believed Mr. Gravitt was intoxicated but could not tell what substance he had taken. Tr. II 86. He did not seem fully awake; his eyes were droopy, and his speech was slightly slurred. Tr. II 79-80.

OCPD Officer Nelson was the first to respond to the 911 call. Tr. II 88. When learned the couple had left the Walgreens he radioed the two were headed north on Pennsylvania. Tr. II 90. Officer Tyler Duncan went to the area around 85th Street and Pennsylvania upon receiving that information. Tr. II 101. He first saw the two on 85th Street and as he was coming to that area and he advised headquarters of his location and that he found the two people Tr. II 102. He pulled his patrol car near Petitioner and Ms. Tabor. He exited his car and asked them to talk. Tr. II 104. Ms. Tabor dropped what she was holding and put her arms in the air. Tr. II 104. Petitioner continued walking.  Officer Duncan announced "police" and tried to catch up with him. Tr. II 105.  Petitioner looked over his shoulder and pulled a firearm and shot at the officer three times. Tr. II 105-106.  One bullet flew by Officer Duncan's head and hit the windshield of his patrol car. Tr. II 106.  Petitioner ran across Pennsylvania Avenue with Officer Duncan in pursuit. Tr. II 107. Officer Duncan fired two shots at Petitioner as he crossed Pennsylvania but missed. Officer Duncan returned to his patrol car to report "shots fired." Tr. II 108. Officer Nelson heard the shots fired, talked to Officer Duncan and then pursued Petitioner. Officer Duncan took Ms. Tabor into custody. Tr. II 110. During the shooting interview Officer Duncan told another officer that Petitioner's eyes looked "crazed" and he thought Mr. Gravitt was on something. Tr. II 126.

Officer Cook heard a burglary call from dispatch and responded to the home of Kyle Myers. Tr. II 128-129; 139. He found Petitioner in the backyard sitting on a storage bin with his back to Officer Cook. Tr. II 142, 146. He did not respond to commands to get on the ground but instead stood up and walked at an angle into the yard. Tr. II 151, 152. Then he put his hands behind his

head; went down to his knees; then stood back up and lowered his hands. Officer Cook released his dog; back-up officers arrived; and Petitioner was taken into custody. Tr. II 158. His gun was discovered under a bush. Tr. II 159.  Despite his Petitioner's intoxication the police interviewed Petitioner and the interview was recorded. State's Trial exhibit 58.

Brittany Tabor testified she was living with Mr. Gravitt in April and May of 2014 at his father's house on South McKinley. Tr. III 43. Petition  er was using heroin and pills while she was using heroin, pills and methamphetamine. Tr. III 43. She estimated that on the night of the shooting Petitioner took 8-9 Xanax pills — the highest doses available. Tr. III 44. They also split a gram of heroin and then walked to Walgreens. She did not remember anything happening between Mr. Gravitt and one of the Walgreens employees. Tr. III 45. She remembered a police officer pulling up and trying to talk to them, and remembered Petitioner firing two shots. She was unsure if the gun was pointed at the officer. Tr. III 49. Her lack of memory was due to the drugs she used. Tr. 46.

Petitioner also testified and explained he had no memory of what happened due to the heroin and Xanax he had ingested. (Tr. III 62-63) He was twenty~six (26) years old.  In 2007, at the age of nineteen (19),he was severely injured and became dependent on Oxycodone and Xanax. Tr. III 56-57. When the prescriptions ran out he bought street drugs. Tr. III 57. He used heroin to self-medicate the withdrawal symptoms. Tr. III 57. A year before this arrest he was clean for a year but relapsed in 2014. He attributed his relapse to depression; joblessness and problems his father was having. Tr. III 58. He again started using Xanax and heroin.  When he relapsed the drugs affected him more than before; he was falling deeper into depression and was "a little bit suicidal." Tr. III 59. He had also reunited with his ex-girlfriend who had been staying with him for two weeks and they used drugs the entire time. Tr. III 59-60. The gun belonged to her. He had the gun because he felt threatened by a different ex-girlfriend and her husband. Tr. III 60.

On the day in question, shortly after midnight, he bought more Xanax. He took a couple of

4

the 2 mg. bars and doesn't remember anything after that. Tr. III 61. He and Ms. Tabor also had between 1 gram and 1. 2 grams of heroin that they used that night. He didn't remember anything until waking up handcuffed to a bar at the Oklahoma County Jail the evening after he was arrested. Tr. III 62. He found out what he had been charged with when he called his mother. Tr. III 64.

## C. ARGUMENT GROUND ONE

Petitioner was denied his constitutional right to a fair trial and to present a defense due to the trial Court's complete refusal to Instruct on his only defense. The defense pursued a voluntary intoxication defense throughout the entire trial and was the defense focus was on cross examination of each witness and requested instructions.

### 1. The State Court Decision Was Based upon an Unreasonable Determination of the Facts and Unreasonable Application of Clearly Established Federal Law

The OCCA determined this issue on the merits but first stated the test to be applied:

> . . . .whether sufficient evidence has been introduced to instruct the jury on voluntary intoxication is whether the evidence establishes a *prima facie* case of voluntary intoxication as defined by law. The evidence may come from any source and should not be weighed by the trial court. *Jackson v. State*,964 P. 2d 875, 892 (Okl. Cr. 1998).

 The OCCA entered a one sentence finding and order, "The trial court did not abuse its discretion here, as the evidence showed that Appellant "was not in the advanced state of intoxication he attempt[ed] to assert" at trial," *citing Turrentine v. State*, 1998 OK CR 33, ir 31, 965 P.2d 955, 969 (Okl. Cr. 1998).  See Attachment Three (3). This decision was "contrary to and involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court and was based on an unreasonable determination of the facts in light of the evidence presented." See 28 U.S.C. § 2254(d)(1)-(2). The OCCA summary opinion is not entitled to deference and is not a restriction on the grant of relief. 28 U.S.C.§ 2254(d)(2).

Every defendant has the right to present a defense and is entitled to Due Process of Law. It is a Constitutional maxim that defendants are guaranteed a "meaningful opportunity to present a

complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006), *citing Crane v. Kentucky*, 476 U.S. 683, 690 (1986) and *California v. Trombetta*, 467 U.S. at 485); *see also* Holmes, 547 U.S. at 324-27 (discussing cases where defendants were precluded from presenting a defense). The parties and the district court applied the most recent Oklahoma law on voluntary intoxication. *Cuesta-Rodriquez, supra*. Both parties briefed the issues on direct appeal based on *Cuesta* and *Malone*. Appellant's Opening brief cited and argued *Cuesta-Rodriguez,* at 11, 12, 13, and 14. Respondent did likewise. *See* Appellee's Brief at 17, 18, 19,20, 21. Instead, the OCCA applied *Turrentine v. State*, *supra*, that applies a different standard. The appellant must show that the effects of the alcohol or drugs were such that he was *rendered totally incapable of forming the requisite intent* to commit murder, *Turrentine* at 969.[2]

Applying the *prima facie* test, the evidence established he was entitled to the instruction under either *Cuesta-Rodriguez, Malone* or *Turrentine* because the evidence established a prima facie case of intoxication. Oklahoma Law protects a defendant's right to a jury instruction addressing his theory of defense where there is evidence to support it, even if the evidence is discredited. *Ball v. State*, 173 P.3d 81, 89 (Okl. Cr. 2007). The OCCA clarified in *Malone* that a "prima facie case of voluntary intoxication . . . . .as with all affirmative defenses, [the evidence] may come from any source and should not be weighed by the trial court — [but] leave weighing of the evidence to the finders of fact, in whose judgment our system of trial by jury is based. *Malone*, 168 P.3d at 196. However, Petitioner's jurors were prevented from determining whether Petitioner was so "utterly intoxicated" he could not form specific intent. The court made the himself the decision maker and this is contrary to the maxim that Judges decide matters of law, and juries decide matters of fact. Okla. Stat. tit. 22, § 834 (2001).

---

[2]It must be noted Dr. Lipman's testimony and opinions clearly meet this standard as presented in Ground Two.

Petitioner was more intoxicated than Malone, but Malone received a voluntary intoxication instruction. *Malone v. State,* 168 P.3d at 196-97. Malone used methamphetamine continuously for 22 days prior to the homicide and had not slept. *Malone* at 194-95. The day of the homicide he took some Lortab. He recalled some details surrounding his killing of an Oklahoma Highway Patrolman but was confused about all of the facts and what happened. *Id.* Like in *Malone*, it is undisputed Petitioner ingested a substantial quantity drugs, in this instance heroin, Xanax, heroin and alcohol through out the night with the last large dose of xanax "shortly after midnight" — he took a couple of 2 mg. bars of Xanax and doesn't remember anything after that. Tr. III 61.

Mrs. Webber (Walgreens) smelled a strong odor of alcohol. "You could smell the alcohol on him." Vol. III, 43, 70. No medical evidence refuted Petitioner's testimony that he did not remember what happened nor was he aware of his actions. No evidence was introduced establishing he was in any mental state other than a drug induced amnesia while at Walgreens, and when Officer Duncan encountered him and described the look in his eyes as "crazed." In fact, the detectives conducting the custodial interview spent almost the first ten (10) minutes just trying to ensure Petitioner was cognitively alert enough to know what was going on. They decide to wait "a few days", presumably when the drugs wore off.

Certainly, Petitioner was not malingering because at the first of the interview he denied using drugs except his prescribed medicine and never remembered drinking alcohol even though Mrs. Webber could smell it on him. The evidence presented by the defense was sufficient to establish a *prima facie* case of intoxication. Given Petitioner's lack of memory or understanding of what had happened a properly instructed jury might very well have decided he couldn't form the specific intent to shoot with intent to kill or assault with intent to injure. The trial court breached it's duty to accurately and comprehensibly instruct on the defendant's theory of defense using the Oklahoma Uniform Instructions (OUJI). *Malone v. State*, 168 P.3d 185, 198 (2007). Because the trial court

denied Petitioner's requested voluntary intoxication instruction he was denied the right to present a defense. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006), *citing Crane v. Kentucky*, 476 U.S. 683, 690 (1986) and *California v. Trombetta*, 467 U.S. at 485); *see also Holmes*, 547 U.S. at 324-27 (discussing cases where defendants were precluded from presenting a defense)

### 2.    Denial of Due Process of Law

Likewise, Petitioner was denied Due Process of Law. Oklahoma law clearly establishes "voluntary intoxication" as a defense in crimes where specific intent or *mens rea* is required. The right to present a defense to felony crime is a liberty interest created by the State of Oklahoma. This "is preserved against arbitrary deprivation by the Fourteenth Amendment." *See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980), where Oklahoma denied petitioner jury sentencing that he was to entitled under state law, "simply on the frail conjecture that a jury might have imposed a sentence equally as harsh as that mandated by the invalid habitual offender provision. That is what happened here — Petitioner was denied jury sentencing on whether or not he was capable of forming intent due his drug and alcohol induced intoxication — an "arbitrary disregard of his right to liberty" which is a "denial of due process of law." *Id. See also Murtishaw v. Woodford*, 255 F.3d 926, 970 (9th Cir. 2001) (*Hicks* relief where under a 1977 statute the jury had discretion to reject the death penalty even if it found the aggravating factors outweighed the mitigating factors); *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 10 (1979) (entitlement created where under state law "there is [a] set of facts which, if shown, mandate a decision favorable to the individual"); *See also Vitek v. Jones*, 445 U.S. 480, 488 (1980).

In *Taylor v. Workman*, 554 F.3d 879, 893-94 (10th Cir. 2009), Mr. Taylor, like Petitioner, was under the influence of drugs (methamphetamine). Mr. Taylor shot and killed a man. *Id.* at 882-83. His jury was instructed on a flawed Second Degree Murder instruction — informing the jury he could not be convicted of Second Degree Murder if he intended to "harm" the victim. *Id.* at

886. Relief was granted because there was no dispute that he killed the victim and his defense "centered on the argument he lacked "the specific criminal intent to kill" the errant instruction incorrectly informed the jury that it could not convict him of Second Degree Murder if he intended to harm the victim. *Taylor,* 554 F.3d at 893.

In Petitioner's case the harm was actually worse — the lack of a voluntary intoxication instructions precluded consideration of Petitioner's sole defense — which amounted to a directed verdict of guilt. The jury had no idea they could consider "voluntary" intoxication as a defense. "The jury must be permitted to consider a verdict of guilt of a noncapital offense 'in every case' in which 'the evidence would have supported such a verdict'— not just in those cases where the court believes the lesser verdict would be most consistent with the evidence — the jury must be allowed to make the choice. *Hopper v. Evans*, 456 U.S. 605, 610 (1982). The Oklahoma Uniform Instructions (OUJI) regarding voluntary intoxication from drugs and/or alcohol. Attachment Four (4).

### 3.    The Failure to Instruct Error Was Not Harmless

There was sufficient harm from the lack of an instruction to require relief. Jurors were led to believe Petitioner's claims he was so intoxicated he couldn't remember because he was in a "black out" were "magic." The last word the jury heard came from the prosecutor: Ms. "Tabor knew it was wrong.  The officer did nothing wrong. The defendant knew it was wrong . . .just now, *magically,* can't remember it.  So it should be excused. That's not the law." Vol. IV p. 37. "Magic" is also referenced *at Id.* p. 32.

When analyzing whether an error is harmless in  habeas corpus, federal courts should apply *Fry v. Pliler*, 551 U.S. 112, 119 (2007), and determine did the error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 116 (*quoting Brecht v. Abrahamson*, 507 U.S. at 637 (1993).  *Brecht* is based on *Kotteakos v. United States*, 328 U.S. 750 (1946). To grant relief, the reviewing court must have grave doubts as to the error's effect on the verdict, and if the

court is in "virtual equipoise as to the harmlessness of the error," the court should "treat the error .

. . .as if it affected the verdict." *Selsor v. Workman*, 644 F.3d 984 at 1027 .(10th Cir. 2011) (*quoting*

*Fry*, 551 U.S. at 121 n.3).

The error was not harmless. Instruction No.11, advised the jury that shooting with intent to

kill meant "Intentional - Deliberate; with knowledge of the natural and probable consequences O.R.

134. Starting with *voir dire*, the trial judge led the jury to believe that Petitioner's action speaks for

itself . In closing, the prosecutor reminded the jury of the <u>Court</u>'s verbal instruction regarding

"intent" during voir dire:  When "quarterback Roger Staubach throws the football towards Michael

Irvin we know that his intent was to do just that, throw the ball." Vol. IV p. 8.   This verbal

instruction, coupled with the lack of instruction allowed the prosecution to argue that the act of

shooting established intent and eliminated the defendant's mental status and the "specific intent"

requirement.[3]  No where in the instruction was intoxication mentioned. This was compounded by

the prosecutor's contemptuous mocking of the defense counsel's argument that a defendant could

use drugs and then argue he couldn't remember what he was doing.[4] The prosecutor continued, "[T]o

be so intoxicated your not responsible for your actions," you're going to be in a "*stupor*."You don't

get to just claim, I don't remember, and then kill whoever you want. You don't get to take a few

---

[3] "[He] has a gun . . .points it right at Officer Duncan, didn't point it in the air, didn't point it in the ground. . . . fires three times. *Id.* 14-15; He knew what he was doing . . . . .knew exactly what he wanted. He intended to hurt Rhonda Webber and kill Officer Duncan. *Id.* You don't aim at the head of a person and shoot if you don't want to kill them . . . .everyone knows what that will do. Doesn't matter *how drunk or high you are* you know it's wrong to shoot at someone when you know it will kill them. Vol. IV p. 36.

[4] Defense attorney argues the defendant was intoxicated. *How drunk or high do you have to be that you shouldn't be held legally responsibility for your actions*? He was able to walk around, carry on conversations, be responsive . . . .able to out run two officers . . pull a ten-pound trigger . . . . .He was in control of his actions the entire time. He likes to blame it on the drugs he did. Yes, alcohol and drugs may lower your inhibitions. . . . .  *But that doesn't mean he couldn't form the intent to do what he did*. Vol. IV *Id.* 28.

Xanax and then kill whoever you want, to not be responsible. How many murders would there be?" *Id.* 31. This mockery was caused by the court denying the instruction but then allowing the prosecutor and defense to argue intoxication or lack thereof — so what was the purpose?  There is no indication how each individual juror defined "stupor" because there was no guidance. It is described numerous ways in layman discourse and literature.[5] After winning the instruction argument, the state asked the defense be precluded from arguing intoxication. The court ruled "both sides can argue the evidence, and the evidence is, that he was intoxicated. And the jury can make their own decision. . . . . .you can't argue that it's a legal defense but certainly, you can argue the facts and your reasonable inferences therefrom. Defense counsel then stated: "Basically, there's still *a reasonable doubt as to his intent*. THE COURT: Absolutely. I think you clearly can argue that based on the evidence." Vol. IV at 5-6. This begs the question — if Judge Elliott believed there was evidence for defense counsel to argue "a reasonable doubt as to his intent" due to intoxication then how can the Court not give a proper instruction on the issue of voluntary intoxication?  Petitioner was denied a defense he was entitled to under Oklahoma Law because the court refused to instruct on his theory of defense. The jury was left to create their own definition of intoxication and stupor.

The *Brecht/Kotteakos/Fry* standard is not an inquiry whether the jurors were "right in their judgment," nor is it an inquiry whether the evidence against Petitioner was overwhelming; the proper analysis is  *the impact of the error itself. See Kotteakos*, 328 U.S. at 764 (*quoted in Brecht*, 507 U.S. at 642-43 (Stevens, J., *concurring*)). It is not the strength of the evidence or probability of conviction, but whether the error *may* have substantially affected *the actual thinking of the jurors*

---

[5]In <u>Treasure Island</u> by Robert Louis Stevenson "weariness grew upon me; a numbness, an occasional stupor, fell upon my mind even in the midst of my terrors, until sleep supervened . . . . ." Chapter 23. Mark Twain, in <u>Tom Sawyer</u> uses stupor differently "dreadful days and nights dragged their tedious hours along, and the village sank into a hopeless stupor - Chapter 30.

or the *deliberative processes* by which they reached their verdict. *Id. (Emphasis supplied)*.  That is exactly what happened here.

Petitioner's jury had no idea that "voluntarily" taking drugs and drinking alcohol then blacking out to the point of amnesia is a defense to "specific intent."  Based on the erroneous instructions, the jury was unable to give effect to the voluntary intoxication argument or defense, even if the jury believed Petitioner was so "utterly intoxicated" he did not deliberately intend to kill Officer Duncan or injure Mrs. Webber.  *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993) (juries are presumed to follow their instructions). Petitioner's right to a fair trial was violated due to the lack of the instruction and he respectfully requests this Court issue the Writ and vacate the judgment.

## VI.  GROUND TWO

**DIRECT APPEAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO PRESENT THE AVAILABLE WINNING CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT AVAILABLE EXPERT TESTIMONY FROM A QUALIFIED EXPERT REGARDING PETITIONER'S INTOXICATION.**

The Facts and Argument in Ground One is incorporated here by reference.

### A.  Exhaustion

This issue is now fully exhausted. Post-Conviction Relief was denied on this issue. See trial denial  Attachment Ten (10) and the OCCA denial on appeal attachment Twelve (12).

### B.  Standard of Review in Federal Habeas

To succeed on his ineffective assistance claim, Petitioner must show (1) his appellate counsel's actions were constitutionally deficient because they were objectively unreasonable and (2) there was resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In deciding whether counsel's performance was deficient, we "look to the merits of the omitted issue." *Cargle v. Mullin*, 317 F.3d at 1202 (*quoting Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001). Underlying claims that are plainly meritorious establish deficient performance. *Id*.

### C.  Post-conviction Proceedings in the State District Court

Prior to filing the Post-Conviction application counsel conducted an investigation that included interviewing and locating an expert witness that could evaluate the facts of the case and also interviewed trial and appellate counsel concerning their investigation into expert testimony and decision not to present such evidence at trial or on direct appeal.  Based the affidavits of Bill Foster, trial counsel, Andrea Miller appellate counsel and Dr. Jonathan Lipman neuropsychologist the Assistant Oklahoma County District Attorney stated in her Response that Petitioner's claim may be decided on the issue of prejudice prong of under *Strickland v. Washington*: "Whether the outcome of the trial would have been different if counsel had presented an expert to support a voluntary intoxication defense." Respondent conceded the issues could not be resolved on the record under 22 O.S. § 1084 joined in Petitioner's request for an evidentiary hearing. Dist. Ct. Response  at 9.

### D.   The State District Court Evidentiary Hearing on Ground Two

### 1.  Testimony of Neuropharmacologist Dr. Jonathan Lipman, PhD.

Dr. Jonathan Lipman testified that he is a neuropharmacologist and he prepared the affidavit and amended report admitted. See Attachment Five (5). Dr. Lipman explained that pharmacology is an expertise dealing with drugs, how they work, what they do. Neuropharmacology is a division of pharmacology dealing with the affects of drugs on nerve, brain and behavior.  He works in industry, research and developing new psychoactive drugs and drugs used in neurology and psychiatry and he also teaches neuropharmacology at the college level.  He advises psychologists and psychiatrists regarding drugs, drug interactions, drug gene food interactions and interactions particularly in psychiatry between the therapeutic and the adverse affects of drugs and underlying psychiatric illnesses. EH Tr. At 13-14.

He also advises business, professions and industry and does "fitness to work" assessments of physicians and lawyers, policemen and pilots. He estimated that since 1980 he had testified five

times per year for a total of 190 times. He has testified numerous times in criminal cases  EH 16.

He explained the characteristics of heroin and Xanax and their affect on the human physical actions, memory and performance in the human brain. Heroin  acts on the MU receptor in the brain whereas Xanax, which is a benzodiazapine acts on the Gamma-aminobutyric acid receptors in the hippocampus of the frontal lobes. These are entirely different mechanisms of action but they also commonalities of affect such as tranquilization, retardation of response time. Both of them produce a soporific state but beyond that their actions are entirely different. The Xanax type drugs, (benzodiazepines) produce disinhibition. They interfere profoundly with memory and they interact in that regard on memory and consciousness when ingested with alcohol. Alcohol and the benzodiazapine  drugs like Xanax both act in the same GABA  receptor, albeit different parts of that same receptor.  The combination of these two drugs produces a twilight state. Both affect cognitive function and the Xanax does so more severely and profoundly. EH 21. The combination of the two affects consciousness of what someone is doing due to the "additive" interaction  at different brain loci so that the affect of the combination is more profound than the individual drugs. EH 22-23.

Dr. Lipman was aware of the following facts and assumed they were true. On May 4th the day in question, shortly after midnight, Petitioner bought more Xanax. He took a couple of the 2 mg. bars and doesn't remember anything after that. Trial Tr. III 61. He and Ms. Tabor also had between 1 gram and 1. 2 grams of heroin that they used that night. Tabor testified Petitioner was using heroin and pills while she was using heroin, pills and methamphetamine. Trial Tr. III 43. She estimated that on the night of the shooting Petitioner took 8-9 Xanax pills — the highest doses available. Id 44. They also split a gram of heroin and then walked to Walgreens. She did not remember anything happening between Mr. Gravitt and one of the Walgreens employees. Id. 45.

Based on Petitioner's weight and height at time he was booked into to jail (based on Exhibit 8 - Attachment 8). It was Dr. Lipman's opinion Petitioner's blood concentration was between 185

and 234 micrograms per liter which is "toxic" and "way beyond the therapeutic blood level." In fact — it is "within the range of postmortem blood concentrations that have been reported in suicide by Xanax." Id. 27-28. Based on this concentration it was the doctor's opinion that at the time Petitioner Gravitt confronted Ms. Weber outside of Walgreens, his mental state or his clarity of mind and his consciousness at the time Petitioner was "suffering under an automatistic condition." He testified that in this condition an individual may walk and talk automatistically without appreciation for what they are doing or saying at the time and with no later memory of having acted or spoken." EH 31. Cognitive function was also impaired, including awareness, orientation and judgment. *Id.*

Thirty Minutes later at 2 o'clock a.m. when Petitioner he encountered Officer Tyler Duncan it was Dr. Lipman's opinion that based ingestion of Xanax, heroin and alcohol Petitioner would have been in a state of automatism that deprived him of the clarity of mind and requisite cognitive function necessary to consciously fire the weapon with the intent to kill Officer Duncan. In other words, "He would not know what he was doing" when he fired the weapon at Officer Tyler Duncan. There is a continuum of anesthesia and consciousness such as in outpatient surgery where these drugs are relied on to delete the patients memory of the surgery. In post-surgical recovery rooms patients are moving, talking and get out of bed unless they are tied down. They will say or do inopportune things such as groping nurses. They have no later memory of this when the drug wears off. Tr. EH 35.

He explained Xanax (benzodiazapine), even in therapeutic doses, prevents the transmission of memories from short to long term so that second by second the things that people are doing in that state are being deleted. The memory is not available later because it is not there. Like the post-op patient, they may talk, they may walk, they may appear to be purposeful but none of their recollections will be available to them because they are not laid down in memory. EH 36-37.

Dr. Lipman examined Okla. Stat. Title 21 Section 152 (6) "All persons are capable of committing crimes, except those belonging to the following classes" except . . . (6) Persons who

15

committed the act charged without being consciousness thereof." EH p. 39.   He agreed Petitioner's

actions during the assault and the shooting were consistent with this description.

Dr. Lipman testified that Officer Duncan's statement to officers that interviewed him after

Petitioner was arrested on May 14 was that "Mr. Gravitt's eyes looked crazed and he looked quote,

"like he was not there". He told another officer that Gravitt might be on something. So he's

describing this altered state of consciousness.   EH 41 referring to Trial Tr. II at 126.   Judge Elliot

read this portion of the trial transcript into the record. A. Question: "You saw his eyes"? Answer:

"Uh-huh". Question: "You testified you saw his eyes. And you told Detective Carter that based on

his eyes you knew he wasn't there. Do you remember saying that?" Answer: "His eyes were very

crazed. Like, yeah, they were open. Very crazed-looking." Question: And you also knew that -- do

you remember also telling Detective Carter that you thought he might be on something?" A. Yes. Tr.

II at 126 (emphasis supplied).

Dr. Lipman explained that Petitioner had developed some tolerance from using Xanax for a

period of time prior to taking the massive dose. However, that could not protect him from a 16 to 18

milligram toxic dose. This consideration of tolerance did not change his opinion because the amount

of Xanax ingested by Petitioner exceeds any therapeutic dose. He believed Petitioner's life may have

been saved because developed a little tolerance from his prior usage. EH 46-47. The dosage

described by Ms. Tabor  and Petitioner was potentially lethal. He told of seven cases of reported

suicide where blood levels of Xanax were lower than Petitioner's at the time of the shooting. EH 47.

His opinions regarding Petitioner's drug dosage on May 4th is based on reporting of Ms. Tabor and

Mr. Gravitt. EH 60.

### 2.    Bill Foster  - Trial Lawyer Testimony at State Evidentiary Hearing

Attorney Bill Foster testified he stated working at the Public Defender's office in August

2014 — four months before Petitioner's trial. He testified his affidavit, Exhibit 5 (Attachment 5),

was true and correct and it was admitted. EH 97. He explained that at the time of trial his sole defense was that the defendant was so intoxicated that he could not form the specific intent to kill. EH 98. It was his opinion that lay people could give their opinion on whether or not a person was intoxicated. He expected the jury to be able to assess whether he  was so intoxicated from these drugs that he was not conscious or unable to form intent.  He believed the best evidence was the defendant had no recollection of the events and that all of the witnesses who had any contact with Mr. Gravitt on that evening testified that he was intoxicated to varying degrees.  EH 100. However, he also agreed that he had no one to explain to the jury why Xanax in that amount, and in combination with heroin, would affect his ability to recall or to remember what happened. He did not consult with any expert, neuropharmacologist or any expert about the affect of what level of intoxication Mr. Gravitt suffered.  EH 101-102 "He would have loved to have an expert" but he did not ask Robert Ravitz, Chief Public Defender for funds to hire an expert nor did he ask Petitioner's family for funds. He was aware that although Petitioner was indigent, that the family could have provided expert funding.  EH 104.

He felt that under Oklahoma law and the testimony and the video evidence from Walgreen's and detective interviews he would be able to get a voluntary intoxication instruction without an expert. EH 105-107 He was able to elicit from the pharmacist that Xanax is a sedative and heroin is an opiate and the effect is exacerbated when you take then together.  EH 109 He agreed that even though he was not granted an instruction the judge did allow counsel to argue that Mr. Gravitt's state of intoxication negated the element of intent necessary for the shooting with intent and necessary for the assault with a dangerous weapon.  EH 110.

Defense counsel felt the missing piece from his defense is the lack of instruction. However, when asked about his failure to retain an expert he admitted "that would have been -- that is the only way that I know I could get the instruction based on the current state of the  law. EH 110. However,

17

he conceded that even with the voluntary intoxication instruction the laymen jurors would have no way to know how eight or nine pills of Xanax would affect Jerad Gravitt's brain and his mental processes on May 4th, 2014.  EH 111-112.  He agreed an expert could have explained that based upon the doses of Xanax and heroin, Petitioner was not conscious at the time he fired the shots at Ofc. Duncan or when he assaulted Mrs. Webber.  He agreed that expert testimony would have also corroborated the defendant's testimony that he could not remember what happened.  He also agreed that without expert opinion it appears that a defendant is using his testimony to diminish his involvement.  EH 113.

### 3.    Andrea Miller  - Direct Appeal Counsel Testimony at Evidentiary Hearing

Assistant Public Defender Andrea Miller was counsel on direct appeal. Her affidavit Exhibit 4 attachment Six (6) was introduced. She believed the denial of the voluntary intoxication instruction was the most important issue on direct appeal. She conceded there was no evidence to explain to the jury how a 8 or 9 Xanax  2 mg. pills affected the Petitioner's brain. She resorted to citing civil cases in her brief to explain how Xanax interacts with other drugs because it wasn't in the record. EH 116

She was familiar with the *Cuesta-Rodriguez v. State*, 241 P.3d  214 (Okl. Cr. 2011) and *Malone v. State,* 168 P.3d 185, 198 (Okl. Cr. 2007)  and agreed the main difference between *Cuesta*, who didn't get the instruction, and *Malone* who did get it was that Malone had an expert. EH 119. She knew Cuesta did not have an expert because that also was her case. EH 118-119. In Petitioner's case, she did "research to find out what combination of drugs could do to a person, but nothing specific to Mr. Gravitt or this case." EH 120. She did not consult with any expert witnesses to determine if they would be able to assist her in presenting an ineffective trial counsel case. Maybe because of time — "but despite my talking to Mr. Foster about why he did or didn't consult with an expert, it did not occur to me to consult with an expert when making a decision about that issue." EH 121. She did no investigation to determine if there was an expert available that could testify that

18

based upon the ingestion of the Xanax and heroin that Mr. Gravitt would be non-conscious. Id.  If she knew that an expert could say based upon the quantities of drugs ingested that Petitioner  was non-conscious "she would have absolutely used a expert." EH 121. If she knew Mr. Gravitt was so utterly intoxicated that it was impossible for him to consciously shoot Officer Duncan, or to consciously injure Ms. Webber, she would have presented on appeal a claim of ineffective assistance of counsel for failure to obtain an expert. EH 122. She did not talk to the family or her superior about hiring an expert and did not talk to one. Id.

On cross-examination she testified she thought it would be high hurdle to establish ineffective assistance of trial counsel. She believed the trial court's failure to give the voluntary intoxication instruction was going to be successful on direct appeal. She believed that was he strongest argument — "I mean, the voluntary intoxication was the case." EH 129. She made a judgment not to pursue ineffective counsel for not hiring an expert.  She admitted her decision was not "informed before (she)  made that decision . . . . that's "why I was trying to do my own research." EH 130.

At the hearing she was asked to examine Title 21 § 152 (6) that states "Persons who committed the act charged without being conscious thereof" are in a class not "capable of committing crimes." EH 132. She agreed if expert testimony was available in 2014 from a neuropharmacologist that based on the amounts of these drugs consumed that Mr. Gravitt was unconscious, this would have supported a defense under section six (6). She agreed she did not have that knowledge when she made the decision not to use an expert. *Id.* Monetary issues were not an issue because Mr. Ravitz has never denied her request for that reason. EH 134.

She agreed that based on the case law following *Strickland v. Washington* that when a lawyer makes a decision that's not informed, they make a decision not to use an expert — when they don't know what the expert would say, that can be an objectively unreasonable decision. EH 135.

D.  Testimony of Petitioner's Mother Barbara Loudermilk

19

The Petitioner's  mother Barbara Loudermilk testified she had sufficient funds to pay an expert and was willing to do so if asked. She paid all of the defendant's court costs. EH 137-138.

## E.   ARGUMENT AND AUTHORITIES

### 1.   Trial Counsel Failed to Investigate and Present Expert Testimony Regarding Petitioner's Inability to Form Intent Due to Intoxication

Petitioner was entitled to the effective assistance of counsel on his direct appeal. *Kimmelman v. Morrison*, 477 U.S. 365, 378 (1986).  Petitioner's  trial attorney, William Foster, failed to retain an expert to explain to the jury that based on his ingestion of xanax, heroin and alcohol it was impossible for him to form the intent to kill or injure in breach of the guarantee of effective assistance of counsel  under the Sixth Amendment. This claim is reviewed under the two-part standard of *Strickland v. Washington,* 466 U.S. 668 (1984). First, Petitioner must show trial counsel's performance was deficient, and second, he must show the deficient performance prejudiced the defense.  *Id.,* 466 U.S. at 687. Petitioner must show a reasonable probability exists that but for this error there would have been a different result. *Strickland,* 104 S.Ct. at 2068. A reasonable probability "is a probability sufficient to undermine confidence in the outcome."  *Id*. at 694. The *Strickland* requirement extends to a felony defendant's "first appeal of right." *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Petitioner must establish (1) constitutionally deficient performance, by demonstrating his appellate counsel's conduct was objectively unreasonable, and (2) resulting prejudice, by demonstrating a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different.  *Smith v. Robbins*, 528 U.S. 259, 285, (2000). In order to assess an appellate ineffectiveness claim this court "looks to the merits of the mishandled issue" that occurred either before or during the trial that was not presented on direct appeal. *Cargle v. Mullin*, 317 F.3d 1196, 1205 (10th Cir. 2003).

2.      **The *Strickland* Performance Prong**

In the fall of 2014, any trial counsel in a drug/alcohol intoxication case had a duty to investigate and obtain a qualified expert regarding voluntary intoxication where the evidence and the defendant's version of events indicates he was in a "blackout state," or suffering "amnesia" because he was so impaired from Xanax and alcohol. His duty was to explain to the jury and the court in medical and scientific terms that the amount of heroin, xanax and alcohol ingested  by Petitioner would cause Petitioner or any person to be *in a state of drug induced psychosis and lack the consciousness to form the intent to kill or injure. See Malone v. State*  168 P.3d at 195 (Okl. Cr. 2007). The standard for trial counsel's performance in this case was established by *Cuesta-Rodiriquez* and *Malone v. State,* as cited and discussed in ground One. Malone's lawyer knew he needed an expert so he investigated potential experts and then retained a qualified expert to render testimony regarding the effects of methamphetamine while Cuesta's lawyer did  not — explaining why Malone received a voluntary intoxication instruction and Cuesta was denied. Respondent's counsel, on direct appeal in the OCCA, tendered this same argument to distinguish the "lack of instruction" in Petitioner's case from the evidence investigated and presented in Malone's case. The Assistant Attorney General's argument establishes the ineffectiveness of trial and appellate counsel presented in this Ground Two for relief.[6]  *Cuesta* and *Malone* were available to trial and appellate counsel. At trial, the prosecutor argued *Cuesta* and the judge relied on it to deny the intoxication instruction. See Vol. 3 at 79. Prior to the trial and the appeal *Cuesta* and *Malone* provided the roadmap to the defense and established their duty to Petitioner as defined by *Strickland* and it's

---

[6]"[D]efendant's case is distinguishable from *Malone* because <u>his counsel did not present  expert testimony that the combination of drugs could overcome a person's mental powers and produce a 24-hour blackout</u>. *Malone*, 168 P.3d at 195 (Okl. Cr. 2007), (defense expert testified the defendant was "most likely in a state of 'amphetamine psychosis''making him likely to engage in 'crazy, irrational violence' and unable to form "the intent to commit first-degree murder"). See State's Response-  Direct Appeal p. 27 filed November 18, 2015.

progeny. It was clearly their duty to recruit an expert in order to obtain an intoxication instruction and explain to the jury Petitioner was, in fact, telling the truth about the his blackout, lack of memory and his lack of consciousness of mind to form intent.

The State Court decision is an unreasonable application of clearly established federal law — in particular *Strickland v. Washington* and *Wiggins v. Smith*. The OCCA determined that trial counsel's decision that the "evidence to be presented at trial was sufficient to support a voluntary intoxication jury instruction" was entirely reasonable.  *See* Opinions Attachments 10 and 12. Based on the clear authority of *Malone, Cuesta* and *McMurray*, obviously missing in Petitioner's defense was the expert testimony that was present in *Malone* — that ingestion of the large amounts amount of Xanax, Heroin and alcohol in combination rendered Petitioner "non-conscious" and unable to form intent to kill or injure. This testimony was readily available but not presented.

**B.     Counsels Decision Not to Interview and Retain a Neuropharmacologist or Other Expert Was Not supported by a Reasonable and Informed Investigation and Is Not Entitled to Deference as a Strategic Decision**

The decision of the trial judge and the OCCA that counsel's abdication of his duties was unchallengeable as a strategic decision is simply an unreasonable application of Strickland the federal cases in this circuit finding following *Wiggins v. Smith*, 123 S.Ct. 2527, 2637(2003). Although trial counsel's decision-making is afforded a great amount of deference, *see Hooks v. Workman*, 606 F.3d 715, 723 (10th Cir. 2010), the failure to thoroughly investigate a line of defense can constitute deficient performance, *see Anderson v. Sirmons*, 476 F.3d 1131, 1145 (10th Cir. 2007). "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *Strickland*, 466 U.S. at 690.  However, the question is not whether counsel made a strategic decision not to present evidence, but rather whether "the investigation supporting counsel's decision . . . was *itself reasonable*." *Anderson*, 476 F.3d at 1145 (quoting *Wiggins,* 539 U.S. at 523). incantation of strategy does not insulate attorney behavior from

review." *Fisher v. Gibson*, 282 F.3d 1283, 1296 (10th Cir. 2002).

The record underscores the unreasonableness of trial counsel's investigation. There was no excuse other than poor and uninformed judgment for trial and appellate counsel to make the decision not to consult a neuropharmacologist with the expertise to explain that an overdose of combining heroin, Xanax and alcohol will render the person completely unconsciousness and in a blackout rendering it impossible to form the specific intent to kill or injure as required in Counts One and Two. The issue of defective performance and prejudice under *Strickland* are entwined. Counsel's actions relate to both deficiencies and to prejudice."*Fisher v. Gibson*, 282 F.3d at 1304.

Here the decisions of trial and appellate counsel "*resulted from inattention*, not reasoned strategic judgment." *Wiggins v Smith*, 123 S.Ct. 2527, 2537 (2003) Trial counsel Foster knew he needed an expert,"I would have loved to have the testimony of an expert witness to address the voluntary intoxication specific intent issue." Foster Affidavit Exhibit 5 Attachment seven (7). Petitioner was indigent but Mr. Foster did not request funds from the Chief Public Defender or from the Defendant's family. Mr. Foster decided that "based on Oklahoma law, the testimony, the video evidence from Walgreens and the detective's interviews that the jury would be given a voluntary intoxication instruction and we would have a chance to obtain a not guilty verdict on Mr. Gravitt's lack of specific intent." *Id.* It is clear his decision not to investigate available expert opinions on this issue is what caused his failure to obtain an instruction.

Andrea Miller represented Petitioner on appeal and recognized an expert would have been beneficial to Petitioner's defense — that is why she asked trial counsel Bill Foster why he did not seek an expert.  Mr. Foster advised that "he did not contact, consult with, or call an expert relating to Mr. Gravitt's intoxication because he thought the video of Mr. Gravitt's custodial interview was sufficient evidence to get a voluntary intoxication jury instruction." Miller Affidavit Attachment Six. Ms. Miller admitted she did not "consult with any expert witnesses relating to Mr. Gravitt's level of

intoxication." Any competent attorney would have realized the drugs ingested by Petitioner meant nothing to the court or the jury without scientific and neurological explanation. This was "beyond the knowledge of an ordinary layman." *Fitzgerald v. State*, 972 P.2d at 1157.   At the PC evidentiary hearing the state presented no evidence that Dr. Lipman's opinions were counterproductive or fruitless. Thus the investigation of trial and appellate counsel cannot be deemed "reasonable." Failure to investigate stemmed from inattention to available expert testimony as stated in *Malone*, and the decision to not hire an expert was not informed strategic judgment and not a "strategic decision" entitled to deference.

Counsel knew he had no evidence that based on the drugs ingested Petitioner was incapable to form intent to kill. Expert testimony must be introduced if it explains the defendant's actions and could influence the jury's assessment. *See Williams v. Taylor,* 529 U.S. 362, 397–98 (2000); *Smith v. Mullin*, 379 F.3d 919 (10th Cir.2004).  Petitioner testified  that "shortly after midnight, he bought more Xanax. He took a couple of the 2 mg. bars and *doesn't remember anything after that*." Tr. III 61. Dr. Lipman rendered the opinion that while Petitioner was at the Walgreens store and after he left and encountered Mrs. Webber, and then Officer Duncan, Petitioner was "sufficiently intoxicated on a combination of alprazolam, heroin, and probably alcohol, that he would more likely than not have been profoundly impaired in mental functions and was deprived of the clarity of mind and cognitive function necessary to have formed the specific intent to kill." [7]

Both trial and appellate counsel failed to make a  informed and reasonable decision to employ

---

[7]Neuropharmacological impairment produced by alcohol plus alprazolam (Xanax) plus heroin is consistent with "defendant's slurring of speech and most particularly by his self-reported amnesia for events." Alcohol and the benzodiazepines both suppress the withdrawal syndrome and both are disinhibiting *and both cause anterograde amnesia, as described by Mr. Gravitt*. Attachment Five at 6-7. Petitioner suffered from *Organic Brain Syndrome* —  where the brain's frontal lobes . . .are disinhibited from their normal function of suppressing socially unfortunate and impertinent behavior. Id.

an expert to testify it was impossible for Petitioner to form the intent to kill or injure and counsel's inaction toward the only available defense does not approach "a reasonable facsimile of trial strategy" and the prosecution's case was not subjected to meaningful adversarial testing — undermining the centerpiece of the adversarial process.

### C. The Decision Not to Present an Expert Is Objectively Unreasonable

All parties agree that "voluntary intoxication" was the "central issue," the only theory of the defense, the focus of both parties and the Court. The decision not to interview or call an expert to render the available opinions "was so patently unreasonable that no competent attorney would have made it." *Bullock v. Carver*, 297 F.3d 1036, 1044 (10th Cir.2002). When counsel's choice is the centerpiece to the theories of the prosecution and defense, counsel's obligation to counter the prosecution's evidence is heightened. *See Rompilla v. Beard*, 545U.S. 374,125 S.Ct. 2456, 2462, 2467 (2005).In *Paine v. Massie*, 339 F.3d 1194 (10th Cir.2003), failure to present expert testimony to help the jury understand battered woman syndrome, was deficient and below any objective standard of reasonableness. *Id.* at 1204-05. As in Petitioner's case, "the propriety and admissibility of such evidence was well settled. *Id.* at 1202. *See Malone*, 168 P.3d at 195 as advanced by the State on direct appeal see FN 6 this brief.

### D. Prejudice From the Lack of Expert Requires Habeas Corpus Relief

In denying Petitioner's failure to instruct claim on direct appeal the OCCA held: "[T]he evidence showed that Appellant "was not in the advanced state of intoxication he attempt[ed] to assert" at trial." Attachment three (3) at 3. This deficiency would have been cured by Dr. Lipman's testimony and establishes a probability sufficient to undermine confidence in the outcome. Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, at least one juror would have struck a different balance . . ..then prejudice is shown." *Littlejohn v. Trammell*, 704 F.3d 817, 861(10th Cir. 2013) (*quoting Wiggins v. Smith*, 539 U.S. at 537). If the "at least one

25

juror" test is met, the "substantial test" is also met, because it produces a "different result." *Littlejohn, supra*.

Petitioner Gravitt was prejudiced by trial counsel missing the opportunity to explain to the layman jury, in accepted neurological terms, how Petitioner's version of events and lack of memory was completely truthful and accurate. This court must "look to the merits of the mishandled issue,"*Cargle v. Mullin*, 317 F.3d 1196, 1205 (10th Cir. 2003).

The neurological explanation for Petitioner's amnesia and his inability to form specific intent to kill and injure was withheld from the jury — exactly the same thing that occurred in *Jefferson v. Upton,* 130 S.Ct. 2217, 2219 (2010),"as far as the jury knew Jefferson did not suffer from brain damage or neurological impairment; he had no organic disorders; and his emotional stability, impulse control, and judgment were perfectly normal." *See also  Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir.2004) ("[E]vidence of Mr. Smith's mental retardation, brain damage" was concealed from the jury.)  See *also Bowen v. Kemp*, 832 F.2d 546, 550 n. 11 (11th Cir. 1987) (The expert testimony could have established that the defendant "did not have the requisite intent for the crime charged."*See also United States v. Sloan,* 933 F.2d 833, 842 (10th  Cir. 1991) (excluded evidence of lack of intent evidence required reversal — "excluded reports supported his theory of defense,") *citing Crane v. Kentucky,* 476 U.S. 683, 690 (1986) (exclusion of the mental condition of an accused may result in  "a meaningful opportunity to present a complete defense.");  *Dunn v. Roberts*, 963 F.2d 308, 314 (10th Cir. 1992) (in an aiding and abetting case the defendant was entitled to funds to retain a psychiatric expert to explain that battered woman's syndrome resulted in the inability to form intent. *Id.* at 314. *See also, United States v. Austin*, 933 F.2d 833, 841 (10th Cir.1991)(Expert testimony is considered crucial to defendant's intent and the right to present a defense) See also *Hughes v. Mathews*, 576 F.2d 1250, 1256-57 (7th Cir.1978); *United States v. Staggs*, 553 F.2d 1073, 1076 (7th Cir.1977);  *United States v. Demma*, 523 F.2d 981, 986-87 (9th Cir.1975); *United States*

*v. Brawner*, 471 F.2d 969, 998-1002 (D.C. Cir.1972)

The jury was deprived of evidence that Petitioner was non-conscious and incapable of forming intent to kill or injure and an instruction telling the jury how to consider this evidence that amounted to an absolute defense. Instead, they were left with Judge Elliot's verbal instruction during voir dire that was repeated by the prosecutor in closing: "when Roger Staubach throws the football towards Michael Irvin we know that his intent was to do just that, throw the ball." Vol. IV p. 9. This incorrect and highly prejudicial guidance was amplified by the prosecutor:  "Doesn't matter *how drunk or high you are* you know it's wrong to shoot at someone when you know it will kill them." Vol. IV p. 36. This Court should have no confidence in the outcome and there exists a "reasonable possibility"that had the Court properly instructed the jury and had they been able to consider Dr. Lipman's expert testimony at least one juror would have reached a different result.

## VII. GROUND THREE - CUMULATIVE ERROR

The Supreme Court recognizes the right to a fair trial and Due Process. *Taylor v. Kentucky*, 436 U.S. 478, 487 n. 15 (1978) (the cumulative effect of damaging circumstances violated the due process guarantee of fundamental fairness). Due Process right to cumulative prejudice from two or more errors.  *See United States v. Rivera*, 900 F.2d 1462, 1477 (10th Cir.1990) (*en banc*) Petitioner is entitled to de novo review of cumulative-error unrestricted by § 2254(d)(1)'s restrictions because "there is no antecedent state court decision on the same matter" and this Court judges cumulative error as prior to AEDPA's passage. *Cargle v. Mullin*, 317 F.3d 1196,  1206 (2003). Due to the absence of instruction on the law and the available expert opinion that Petitioner was incapable of forming intent due to his intoxication there exists a reasonable probability one juror would have voted differently . When prejudice from these errors viewed cumulatively, the probability Petitioner was deprived of a fair trial is even more substantial.

## VIII.  PRAYER AND REQUEST FOR RELIEF

The Writ should issue, and the conviction should be vacated with directions to retry Petitioner within 180 days or release him from custody.

Respectfully Submitted,

*s/ Jack Fisher*
Jack Fisher OBA # 2939
Attorney for Jerad Gravitt
P.O. Box 1976
Edmond, Ok 73083
405/ 235-9466
okfishlaw@aol.com

## VERIFICATION

As attorney for Jerad Gravitt I hereby verify and declare that under penalty of perjury that the forgoing is true and correct.

*s/ Jack Fisher*
Jack Fisher